## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| EDWIN JACQUET, a federal inmate, | : | |
| | : | Civil Action No. |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| FEDERAL BUREAU OF PRISONS, | : | |
| THOMAS R. KANE, Ph.D., in his official | : | |
| capacity as Acting Director of the Federal | : | |
| Bureau of Prisons; DAVID ORTIZ, | : | |
| in his official capacity as Warden of the | : | |
| Federal Correctional Institution, Fort Dix; | : | |
| and JOE NORWOOD a/k/a J.L. NORWOOD, | : | |
| in his official capacity as Regional Director of | : | ***DOCUMENT FILED*** |
| the Federal Bureau of Prisons Northeast | : | ***ELECTRONICALLY*** |
| Region, | : | |
| | : | |
| Respondents. | : | |

## PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241

## PRELIMINARY STATEMENT

Petitioner Edwin Jacquet (Register # 69422-053) is an inmate at the low-security Federal Correctional Institution, in Fort Dix ("FCI Fort Dix") in New Jersey. Edwin was originally sentenced to 63 months, but earned substantial good conduct time credit ("good time") for exemplary behavior [*See* 18 U.S.C. § 3624(b)(1); 28 C.F.R. § 523.20(a), (c)(1)][1], as well as a twelve-month sentence reduction for his participation in the intensive Residential Drug Abuse Program (the "RDAP")[*See* 18 U.S.C. § 3621(e)(1); 28 C.F.R. § 550.57]. After serving 32 months

---

[1] *See also* BOP Program Statement 5884.03 (3/31/2006), "Good Conduct Time Under the Prison Litigation Reform Act"; BOP Program Statement 5880.28 (7/20/99), Sentence Computation Manual. As set forth in the relevant regulations, BOP will award "54 days credit for each year served . . . if the inmate has earned or is making satisfactory progress toward earning a GED credential or high school diploma . . . ." [*See* 28 C.F.R. § 523.20(c)(1)].

in federal prison, Edwin was transferred to the Bronx Community Reentry Center (the "BCRC"), a halfway house, to complete his sentence and begin his transition back into society.

Unfortunately, during a visit with his mother and sister, Edwin consumed six breakfast biscuits, which contained poppy seeds.  Once Edwin realized the breakfast biscuits contained poppy seeds, he notified halfway house staff.  Thereafter, a random drug urine test indicated minimal amounts of opiates (codeine and morphine) in system, consistent with the consumption of poppy seeds.  Despite Edwin's requests, halfway house staff failed to inform the drug-testing laboratory of Edwin's poppy seed consumption, and, subsequently, Federal Bureau of Prisons (the "BOP") staff failed to order a hair drug test, which would have confirmed that Edwin had not consumed opiates.  Hair drug testing is a widely used, scientifically sound alternative to urinalysis used by many well-respected drug testing companies, including the BCRC's drug test administrator, LabCorp.

After a hasty disciplinary hearing, the BOP revoked a significant portion of Edwin's good time (85 days) and removed him from the RDAP, resulting in the forfeit of the entirety of his RDAP credit (12 months).  Edwin was removed from the halfway house and sent to FCI Fort Dix, where he currently remains.  Then, the BOP repeatedly refused Edwin's requests for collection of exculpatory evidence in the form of a hair drug test, which would have been paid for by Edwin's family.  As discussed hereinafter, and as a matter of demonstrable scientific fact, the urinalysis result was likely a false positive based on Edwin's consumption of poppy seeds.  However, Edwin can no longer be exonerated via a hair drug test, since the test is only valid within a 90-day window.

Edwin's misfortune was compounded when the BOP denied his administrative appeal without consideration on the merits.  The BOP repeatedly claimed that Edwin's appeal was untimely, even though the alleged untimeliness was caused exclusively by the negligence of BOP

2

staff members and the BOP's archaic mail system.  Eventually, the BOP simply ignored Edwin's appeal altogether, without even issuing a final determination. The BOP's refusal to accept Edwin's appeal was an egregious violation of Edwin's due process rights and of BOP regulations. Throughout the disciplinary process, the BOP violated Edwin's due process rights and failed to follow its own regulations.

For all of these reasons, the discipline imposed against Edwin should be nullified.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction under 28 U.S.C. § 2241 (habeas jurisdiction) and 28 U.S.C. § 1331 (federal question jurisdiction), as Petitioner is presently in custody under color of authority of the United States, and such custody is in violation of the Constitution, laws, or treaties of the United States.   This Court may grant relief pursuant to 28 U.S.C. § 2241, 28 U.S.C. § 1331, 5 U.S.C. § 702, and the All Writs Act, 28 U.S.C. § 1651.

2.      Venue is proper in the United States District Court for the District of New Jersey because Petitioner is confined at FCI Fort Dix, 5756 Hartford and Pointville Road, Joint Base MDL, New Jersey, which is under the direct control of Respondents and their agents and/or employees.

## EXHAUSTION

3.      Edwin has exhausted his administrative remedies.  The BOP found Edwin guilty of the disciplinary charge without allowing him to present exculpatory evidence, denied all of his appeals for purported untimeliness, and then refused to issue a written final determination.

4.      Any further appeals would be futile, and with Edwin originally eligible to be released as early as August 29, 2016 and that date rapidly approaching, the passage of any

additional time in administrative appeals would cause Edwin irreparable harm by exposing him to further unwarranted incarceration.

## PARTIES

5.      Petitioner, Edwin, is a 42-year-old year old man presently in the custody of the Respondents at FCI Fort Dix.

6.      Respondent BOP is the United States federal agency responsible for the administration of the federal prison system.

7.      Respondent Thomas R. Kane, Ph.D., is the Acting Director of the BOP and has system-wide authority over the operations and management of the entire federal prison system, including drug testing, the disciplinary hearing process, the administrative appeal process, staff conduct toward inmates, and the prison mailing system, all of which are at issue in this case.

8.      Respondent David Ortiz is the Warden of FCI Fort Dix, where Edwin is presently being held in custody.  Ortiz has authority over the operations and management of FCI Fort Dix, including the drug testing process, the disciplinary hearing process, staff conduct toward inmates, and the prison mailing system, all of which are at issue in this case.

9.      Respondent Joe Norwood a/k/a J.L. Norwood is the Regional Director of the BOP's Northeast Region and has authority over its operations and management, including the drug testing process, the disciplinary hearing process, the administrative appeal process, staff conduct toward inmates, and the prison mailing system, all of which are at issue in this case.

## STATEMENT OF FACTS

### Good Time and Participation in the RDAP

10.      On March 21, 2012, Edwin pleaded guilty to one count of Conspiracy to commit bank fraud, 18 U.S.C. § 1349, before the United States District Court for the Southern District of

New York (Hon. Naomi Reice Buchwald, U.S.D.J.) and was sentenced to a term of sixty-three (63) months imprisonment.

11.     Edwin self-reported and began serving his sentence on February 4, 2013 at the FCI Fort Dix minimum-security satellite camp.  On or about January 27, 2014, Edwin was transferred to the Federal Correctional Institution, Miami minimum-security satellite camp ("FCI Miami").

12.     On June 8, 2014, while incarcerated at FCI Miami, Edwin voluntarily entered the RDAP, which is the most intensive substance abuse treatment offered by the BOP.  Offenders live in a unit separate from general population and they participate in half-day programming and half-day work, school, or vocational activities.

13.     Edwin successfully completed the grueling nine-month, 500-hour residential component of the RDAP, and on April 17, 2015 he was awarded a "Certificate of Achievement." (A true copy of the Certificate of Achievement is attached hereto as **Exhibit** "**A**").

14.     Edwin immediately entered the second phase (the follow-up phase) of the RDAP, which he completed on August 27, 2015.  During this period, Edwin mentored other inmates in the RDAP, and served as a tutor and computer lab teacher to other inmates.

15.     Edwin also completed various self-improvement courses while incarcerated at  FCI Miami, including "Parenting" (completed May 2014), "Real Estate/Foreclosure" (completed July 2014), "World of Business" (completed October 2014), "Job Skills & Communication" (also completed October 2014), and "7 Habits" (completed November 2014).  (True copies of certificates of completion for these courses are collectively attached hereto as **Exhibit** "**B**").

16.     As a result of his successful completion of the first two phases of the RDAP, BOP awarded Edwin a twelve-month sentence reduction.  (*See* 18 U.S.C. § 3621(e)(2)(B); 28 C.F.R. § 550.58).

17.     Edwin was a model prisoner with no blemishes on his disciplinary record.  As a result, he accrued the full amount of good time to which he was entitled, which would have been approximately 172 days of combined earned and projected good time off his sentence.

18.     On September 1, 2015, Edwin was transferred to the BCRC.

19.     Edwin got an off-site, BCRC-approved job working as a clerk at Worldwide Equities in Brooklyn, New York.  Edwin was successfully transitioning back into society.

20.     Once transferred to the BCRC, Edwin voluntarily entered into the third and final phase of the RDAP (the transitional phase).  Unfortunately, Edwin's well-earned improvement in circumstances would prove to be short-lived, albeit through no fault of his own.

**The False Positive Urinalysis and Inadequate Investigation**

21.     On October 5, 2015, while at his job site, Edwin received a BOP-approved visit from his mother, Cylote Jacquet, and his sister, Thaisia Jacquet.  The women brought Edwin a snack – two packets of Nature's Valley breakfast biscuits containing lemon poppy seeds.  Each packet contained four biscuits.  During the visit, Edwin consumed six of the eight biscuits in the two packets.   Both women witnessed Edwin's consumption of the biscuits.

22.     The packet label on the Nature's Valley breakfast biscuits clearly states "poppy seeds" as an ingredient.  (A true copy of the Nature's Valley wrapper is attached hereto as **Exhibit "C"**).

23.     When he returned to BCRC that evening, Edwin realized that his consumption of the biscuits could trigger a positive urinalysis result for opiates if a random urine test was conducted.  Therefore, he voluntarily informed BCRC staff member Rohan of the situation.  Rohan assured Edwin that this would not be a problem.   However, upon information and belief, unbeknownst to Edwin, Rohan immediately ordered a urinalysis to be administered later that night.

24.     At the time Edwin self-reported to staff member Rohan, Edwin did not know that a urinalysis would be administered that night.  He could have simply withheld the information, secure in the knowledge that drug tests at the BCRC were irregular, random and unlikely to be administered on any given night.

25.     At approximately 10:30 p.m. that night, LabCorp administered a urinalysis, possibly instigated by Rohan.   When Edwin learned he was going to be tested, he asked Rohan to inform LabCorp about his poppy seed consumption.  Rohan, however, failed to advise the LabCorp testing personnel.

26.     Upon information and belief, halfway house staff members are required to notify drug-testing personnel if an inmate reports information that could compromise a drug test result, such as consumption of poppy seeds.

27.     At 8:20 a.m. on October 13, 2015, LabCorp faxed the urinalysis results to the BCRC, which showed a "POSITIVE" result for codeine in the amount of 500 ng/mL[2] (0.5 $\mu g$/mL), and a "POSITIVE" result for morphine in the amount of 317 ng/mL (0.317 $\mu g$/mL). (A true copy of the LabCorp urinalysis result is attached hereto as **Exhibit** "**D**").

28.     At 8:40 a.m. that same day, BCRC staff member Jilary Dunlop drafted an incident report, which charged Edwin with the BOP Offense Code 112 "Use of any narcotics or related paraphernalia not prescribed for the individual by the medical staff" (the "Incident Report"), which is categorized by the BOP as a "Greatest Severity Level Offense." (*See* 28 C.F.R. § 541.13; 28 C.F.R. § 541.4).  The Incident Report was issued to Edwin at 2:00 p.m. that same day.

---

[2] ng/mL = Nanograms/milliliter, or nanograms per milliliter.  $\mu g$/mL means "micrograms per milliliter," as contrasted with ng/mL, which means "nanograms per milliliter."  *See* National Center for Biotechnology Information ("NCBI") list of acronyms/abbreviations at NCBI website http://www.ncbi.nlm.nih.gov/books/NBK38724/.   One microgram = 1000 nanograms (*See e.g.* http://www.unitconversion.org/weight/micrograms-to-nanograms-conversion.html)

29.     When an incident report is issued, the BOP Inmate Discipline Program ("IDP") requires a fair investigation and hearing comporting with the requirements of due process. (*See* BOP Inmate Discipline Program, 28 C.F.R. §§ 541.1- 541.8). The inmate must be given an opportunity to provide a statement, request that witnesses be interviewed, "*or request that other evidence be obtained and reviewed*." *See* 28 C.F.R. § 541.5(b) (emphasis added).

30.     During a meeting with a staff member Villanueva on October 13, 2015, Edwin denied the charge, requested that staff member Rohan be interviewed, and requested an immediate re-test in the form of an additional urinalysis or a hair drug test. Edwin also provided a statement that he believed the false positive was caused by consumption of the Nature's Valley breakfast biscuits.

31.     Despite Edwin's request, a hair drug test was not conducted.

32.     Thereafter, in accordance with the IDP process, the matter was referred to the "Center Discipline Committee" (the "CDC") to review the incident report. (*See* 28 C.F.R. § 541.7). The inmate has the opportunity to appear before the CDC during its review and is "entitled to make a statement and *present documentary evidence* to the [CDC] . . . ." (*See* 28 C.F.R. § 541.7(d), (e) [emphasis added]).

33.     On October 14, 2015 at approximately 2:00 p.m., the CDC conducted its disciplinary hearing without Edwin present.

34.     As indicated in the CDC's written report issued after the hearing (the "CDC Report"), the CDC had before it the following evidence:  Incident Report, LabCorp urinalysis result, urinalysis chain of custody form, Edwin's BCRC residence agreement, the Nature's Valley breakfast biscuit wrapper, a letter from Edwin's mother about the incident in which she stated that she gave Edwin the Nature's Valley breakfast biscuits, and a statement from staff member Rohan

indicating that Edwin "showed him a wrapper and indicated 'it had poppy seeds in it' " before the urinalysis was administered.  (A true copy of the CDC Report is attached hereto as **Exhibit** "**E**").

35.     A hair drug test was not conducted for the disciplinary hearing.

36.     The CDC acted with great haste, conducting an investigation and hearing, and rendering its decision, within approximately 24 hours of Edwin's receipt of the Incident Report. This very short turnaround time between the issuance of the Incident Report and the CDC hearing left Edwin with insufficient time to prepare a meaningful defense.  The rush to judgment also cost Edwin the opportunity to research the issue of false positives caused by poppy seed consumption and to present evidence on the subject to the CDC.

37.     Ultimately, the CDC disregarded all of the evidence other than the urinalysis result, in dereliction of its responsibilities.  Following the hearing, the CDC found that "[t]he act was committed as charged." (*See* **Exhibit** "**E**").

38.     Although the CDC lacked the power to strip Edwin of his good time, (*See* 28 C.F.R. § 541.7(f), it issued a recommendation of a sanction involving "a return to a more secure facility and a loss of all available good conduct time." (*See* **Exhibit "E").**

39.     The next day, October 15, 2015, Edwin was transferred to the Metropolitan Detention Center (the "MDC") in Brooklyn, New York.

40.     On October 15, the BOP summarily removed Edwin from the RDAP and revoked his twelve-month sentence credit without a hearing on the issue of Edwin's status in the Program. (A true copy of the BOP's "Sentencing Monitoring Computation Data as of 1-11-2016" for Edwin is attached hereto as **Exhibit** "**F**".  This document indicates that Edwin completed the RDAP on August 27, 2015 ["3621E CMPL DATE") and was removed from the RDAP on October 15, 2015 ["REMOVED FROM RDAP"]).

41.   On or about November 4, 2015, a Discipline Hearing Officer (a "DHO")[*See* 28 C.F.R. § 541.7(a)], who has the power to strip an inmate of good time *See* 28 C.F.R. § 541.8(g)], approved the CDC's sanction recommendation and signed the CDC Report.  (*See* **Exhibit "E"**). Edwin later learned that the sanctions included the loss of 40 days of vested good time plus 45 days of non-vested good time for a total loss of 85 days of good time out of a total of 172 days of good time (*See* **Exhibit** "**F**" indicating "TOTAL GCT EARNED AND PROJECTED: 172"; *see also* 28 C.F.R. § 541.4, authorizing loss of good time as sanction; *see also* a true copy of the BOP's "Inmate Discipline Data Chronological Disciplinary Record as of 11-15-2015" for Edwin, attached hereto as **Exhibit** "**G**", reflecting the forfeiture of 85 days of Edwin's good time).

42.   Edwin's full prison term would have lasted until on or about May 2, 2018, but he was scheduled to be released on or about August 29, 2016 based on his projected accumulation of good time and RDAP credit.  (A true copy of the BOP's "Sentencing Monitoring Computation Data as of 12-01-2014" for Edwin is attached hereto as **Exhibit** "**H**".  This document indicates: "THE INMATE IS PROJECTED FOR RELEASE: 08-29-2016 VIA 3621E COND").

43.   However, as a result of the aforementioned sanctions, Edwin is now scheduled to be released from incarceration on or about November 11, 2017.  (*See* **Exhibit** "**F**", which indicates "STATUTORY RELEASE DATE PROJECTED: 11-11-2017" and also confirms the sanction of good time forfeiture, as approved by the DHO "11-04-15: DIS GCT/FFT").

**The Administrative Appeal**

44.   On November 19, 2015, Edwin received a copy of the CDC Report, as well as a letter dated November 16, 2015, advising Edwin of his right to file an appeal within 20 days through the Administrative Remedy Program (the "ARP") [*See* BOP Administrative Remedy

Program, 28 C.F.R. §§ 542.10 - 542.19]. (A true copy of the November 16 Letter is attached hereto as **Exhibit** "**I**").

45.  In theory, the ARP provides inmates with the opportunity to obtain redress where the IDP process fails to comport with the requirements of due process. However, as Edwin's futile journey through the ARP process illustrates, it can be a useless remedy in practice.

46.  Prior to receiving the CDC Report, Edwin began researching issues associated with false positive drug test results caused by poppy seeds, including the possibility of exoneration via hair drug test. Accordingly, on November 9, 2015, he made his first "Inmate Request to Staff," directed to his MDC case manager, J. Bencebi, seeking a hair drug test. Edwin wrote:

> "I contacted my attorney who contacted a tech of LabCorp of America who explained the best way to test for heroine [sic] is to do a hair analysis. Hair analysis is accurate for up to 60 days from date in question which is October 5, 2015. I AM REQUESTING that the administration arrange a hair so I can disprove the charge. Either myself or my family will reimburse or pay for the procedure. Please time is running out." (Capitalization in original). (A true copy of the November 9, 2015 Request to Staff is attached hereto as **Exhibit** "**J**").

47.  On November 19, 2015, case manager Bencebi received a *Home Health Testing* brand morphine-codeine hair drug testing kit with a 90-day testing window, paid for by Edwin's mother. (A true copy of the *Home Health Testing* kit receipt is attached hereto as **Exhibit** "**K**").

48.  Case manager Bencebi denied Edwin's November 9, 2015 request, and refused to utilize the test kit.

49.  On December 4, 2015, Edwin, acting *pro se*, submitted his appeal of the CDC Report, in which he described the origin of his predicament, and how his request for a hair drug test had been denied:

> "In the Bronx halfway house I was successfully transitioning back into society, holding a job in Brooklyn, and enjoying visitation privileges, on October 5, 2015, my mother visited me at work and brought me several Nature's Valley Breakfast Biscuits. I ate 6 of the Snacks before I realized they had poppy seeds in them . . . . I asked Case Manager

Bencebi to administer, or arrange for administration, of a hair analysis test that produces a 90 day drug history.  She did not do this and so I have not been afforded the opportunity of disproving my charge.  Hair analysis will not show positives from eating poppy seeds.  Unlike true heroin use, the opioid in poppy seeds does not stay in the bloodstream long enough or in high enough concentrations to be trapped inside hair follicles in measurable quantities.  I am seeking to prove my innocence in a manner that is proven and so reliable that the results can be used in court.  Home Health Testing has provided, prepaid, a Legal Workplace Hair Drug Test Kit to Case Manager Bencebi on November 19, 2015.  It will not cost the BOP anything to corroborate my lack of drug use of any kind.  Unfortunately, Ms. Bencebi has refused to have the test administered, citing liability issues.  She instructed me to have my family contact 'legal' but did not cite the location or phone number of this department and did not return messages so this could be done.  This is the reason for this BP-230.  Region can order this done.  This is what I am asking: a hair drug test to establish my innocence of this charge.  There is no reason to punish me for something that can be proven to be untrue.  To withhold the proper test is a version if withholding evidence.  Please arrange a hair drug test for me.  The window for this opportunity is not open-ended and must be done by January 3, 2016 to be reliable." (A true copy of the December 4, 2015 appeal is attached hereto as **Exhibit** "**L**").

50.     Thereafter, on December 8, 2015, BOP transferred Edwin from the MDC to FCI Fort Dix.  Upon information and belief, the transfer to Fort Dix was a retaliatory response to Edwin's request for a hair drug test and his assertions of innocence, and was instigated by case manager Bencebi.

51.     The BOP's Northeast Regional Office Administrative Remedy Coordinator delivered a "Rejection Notice – Administrative Remedy" to Edwin, dated December 16, 2015.  The Rejection Notice stated that Edwin's appeal was rejected for several reasons:

(1) ALL FOUR PAGES OF YOUR  . . . FORM MUST BE LEGIBLE AND WORDED THE SAME.  PHOTOCOPIES OF THE FORM WILL NOT BE ACCEPTED;

(2) YOUR APPEAL IS UNTIMELY.  REGIONAL APPEALS . . . MUST BE RECEIVED WITHIN 20 DAYS OF THE WARDEN/CCM RESPONSE OR RECEIPT OF THE DHO REPORT;

(3) PROVIDE STAFF VERIFICATION STATING REASON UNTIMELY FILING WAS NOT YOUR FAULT;

(4) PAGE THREE AND FOUR . . . ARE NOT LEGIBLE.  ALSO, YOUR APPEAL WAS DUE AT THE REGION BY 11-24-2015.  IT WAS RECEIVED ON 12-08-15;

(5) YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN 10 DAYS OF THE DATE OF THIS REJECTION NOTICE.

(Capitalization in original).  (A true copy of the December 16, 2015 Rejection Notice is attached hereto as **Exhibit** "**M**").

52.     Contrary to the assertions in the Rejection Notice, Edwin's appeal was timely (having been submitted on December 4, 2015 and received on December 8, 2015), and could not possibly have been "due at the Region by 11-24-2015," since Edwin didn't receive the CDC Report until November 19, 2015 (*See* **Exhibit "I"**).

53.     Complicating matters, Edwin did not receive the December 16, 2015 "Rejection Notice – Administrative Remedy" until after 4:00 p.m. on December 23, 2015, leaving him with an impossibly short amount of time to resubmit his appeal.

54.     As Edwin would later learn, the FCI Fort Dix mailroom erroneously marked the December 16, 2015 Rejection Notice as "does not meet BOP criteria for legal/special mail," even though the Rejection Notice was in fact a piece of legal mail sent by BOP itself.  For that reason, the Rejection Notice was processed as regular mail and not delivered to Edwin's s Unit Team for prompt delivery to Edwin.

55.     Wasting no time, Edwin immediately completed a "Regional Administrative Remedy Appeal" form on December 24, 2015, in which he resubmitted the same content as the December 4, 2015 appeal.   (A true copy of the December 24, 2015 appeal is attached hereto as **Exhibit** "**N**").

56.     Unfortunately, FCI Fort Dix does not have a legal mailroom in which inmates are able to send legal mail out the same day.  Instead, an inmate must go through a counselor on his Unit Team in order to send legal mail.  Outgoing mail is logged into a book and the Unit Team secretary bears responsibility for sending out the inmate's mail.

57. When Edwin attempted to have his "Regional Administrative Remedy Appeal" form mailed on December 24, he learned that all staff members on his Unit Team – including both counselors, both case managers, and the Unit Manager - had all left early for Christmas and would not return until December 28, 2015. As Edwin later learned, December 24 had been declared a half-day for BOP employees.

58. In addition, there was no mailing on Friday, December 25, Saturday December 26, and Sunday December 27, due to the Christmas holiday and the weekend.

59. Thus, Edwin was left with no means of mailing his "Regional Administrative Remedy Appeal" until December 28, 2015.

60. On December 28, 2015, when the Unit Team returned from the Christmas holiday, Edwin delivered his "Regional Administrative Remedy Appeal" to the Unit Team for certified mailing.

61. The BOP's Northeast Regional Office Administrative Remedy Coordinator delivered a "Rejection Notice – Administrative Remedy" to Edwin, dated January 6, 2016, again citing timeliness issues:

(1) YOUR APPEAL OF THE REJECTION IS UNTIMELY . . .;

(2) SUBMIT STAFF MEMO ON BOP LETTERHEAD STATING REASON UNTIMELY FILING WASN'T YOUR FAULT;

(3) PROVIDE STAFF VERIFICATION STATING REASON UNTIMELY FILING WASN'T YOUR FAULT;

(4) YOUR APPEAL OF THE REJECTION DATED 12-16-15 WAS DUE BY 12-29-15. IT WAS RECEIVED ON 1-5-16.

Additionally, the Rejection Notice indicated that "YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN 10 DAYS OF THE DATE OF THIS REJECTION NOTICE."

(Capitalization in original). (Capitalization in original).  (A true copy of the January 6, 2016 Rejection Notice is attached hereto as **Exhibit "O"**).

On January 10, 2016, Edwin, made another "Inmate Request to Staff," this time seeking staff verification from FCI Fort Dix counselor Centeno as to when Edwin's appeal had been mailed.  Counselor Centeno confirmed that his appeal had been logged into the FCI Fort Dix legal mail book and mailed on December 28, 2015, at the first opportunity after the Christmas holiday. However, Counselor Centeno rejected Edwin's request for verification of purported untimeliness on BOP letterhead, as demanded in the December 16, 2015 and January 6, 2016 Rejection Notices, telling Edwin that staff members "do not give memos on letterheads and Region knows this." Thus, Edwin was left with no means of satisfying BOP's demand for staff verification of untimeliness.  (A true copy of the January 10, 2016 Request to Staff is attached hereto as **Exhibit "P"**).

62.    By letter to Respondent BOP Northeast Regional Director Joe Norwood dated January 11, 2016, Edwin challenged the December 16, 2015 Rejection Notice, writing, *inter alia*:

> "I can assure this office that my appeal was timely sent out on December 28, 2015, because it was logged into the legal-mail book on the 28th of December.  Also I have a copy of the certified mail receipt were [sic] I paid $6.63 postal fees to send my appeal to Regional Office.  FCI Fort Dix does not have a legal mailroom in which inmates are able to send legal-mail out the same day.  At FCI Fort Dix an inmate is to go through unit team in order to send his legal-mail out, and once the inmate goes through unit team and get his legal-mail logged into the book and sign his signature in the book, it is left up to the unit teal [sic] secretary to make sure the inmates mail gets to its destination.  Therefore, it is not my fault that the Regional Office did not receive the appeal that was sent certified in the mail . . . . I received the rejection on the 23rd of December that was marked the 16th of December 2015.  I tried to get Officer Lam to sign that I did not receive the rejection until the 23rd of December, but Officer Lam refused to sign.  I also tried to get the letter from staff that the Region requested explaining why my appeal being late wasnt [sic] my fault.  However, Counselor Centeno, Counselor Sims, Case Manager Cusik, Case Manager Josey, and Unit Manager Brinson of the Unit Team was gone early on December 24, 2015, and did not return until December 28, 2015, and I asked Unit Team to provide me with a letter stating that they were not available until the 28th of December but they refused to do so.  Unit Team Counselor Centeno stated that they do not give memos of letterheads to inmates and

that the Region knows of this."  (A true copy of the January 11, 2016 appeal is attached hereto as **Exhibit** "**Q**").

63.      Edwin received yet another "Rejection Notice – Administrative Remedy" dated

January 26, 2016. Despite Edwin's correspondence clearly explaining the reason for the purported

filing delays, the Rejection Notice inexplicably reiterated the BOP's arbitrary position:

> YOUR APPEAL OF THE REJECTION DATED 12-16-15 WAS DUE BY 12-29-15. IT WAS RECEIVED ON 1-5-16.   YOU DID NOT SUBMIT A STAFF MEMO. (Capitalization in original).

This latest Rejection Notice also repeated the same instructions as the previous rejection notices:

> SUBMIT STAFF MEMO ON BOP LETTERHEAD STATING REASON UNTIMELY FILING WASN'T YOUR FAULT and PROVIDE STAFF VERIFICATION STATING REASON UNTIMELY FILING WAS NOT YOUR FAULT.  (Capitalization in original).

Just as previously, the Rejection Notice stated:

> YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN 10 DAYS OF THE DATE OF THIS REJECTION NOTICE.  (Capitalization in original).

 (A true copy of the January 26, 2016 Rejection Notice is attached hereto as **Exhibit** "**R**").

64.      By letter to the BOP Northeast Regional Office Administrative Appeal Coordinator

dated February 1, 2016, Edwin doggedly continued to pursue his appeal, even though the refusal

of FCI Fort Dix staff members to provide the necessary staff verification of purported untimeliness

had already dealt a fatal blow to his chances.  Edwin wrote, *inter alia*:

> "The previous rejection was dated and mailed December 16, 2015 . . . . Several factors led to its delayed delivery to me.  First . . . the FCI-Fort Dix mailroom marked that piece of mail as 'does not meet BOP criteria for legal/special mail.' For that reason, it was processed as regular mail and not delivered directly to my Unit Team for prompt delivery.  Second, this piece of mail arrived at FCI-Fort Dix less than one week before the Christmas holiday. Due to the significantly increased influx of mail during that period, this piece of mail was not delivered to me until after the 4 pm count on December 23, 2015.  In addition to that significant delivery day,  the next four calendar days were without any US mail pick-up or delivery . . . . Therefore, the earliest date I could have placed my resubmission in the mail was Monday, December 28 2016.  This is, in fact, precisely what occurred.  To demonstrate my good faith effort to comply with the timeliness requirement, I utilized the official Inmate Legal Mail System of FCI-Fort Dix to record my resubmission on that date.  This

is verified by the formal response by staff member Centeno to my "Inmate Request to Staff" enclosed with this resubmission. This was also included with my first resubmission and should satisfy the request for a memo from staff on official BOP letterhead." (A true copy of the February 1, 2016 appeal is attached hereto as **Exhibit "S"**).

65.     Edwin did not receive any response to his appeal letter of February 1, 2016.

66.     Running out of options in his futile journey through the ARP process, Edwin filed a last-ditch emergency appeal on a "Central Office Administrative Remedy Appeal" form dated February 28, 2016 and received by the BOP's Administrative Remedy Section on March 7, 2016. Edwin summarized his plight:

> "This request affects my early release. Because this appeal results from my expulsion from the TDAT portion of the drug abuse program, I request that this be treated as an emergency appeal and a staff response be expedited. (See Program Statement § 7430.02 § 8(e)). On 10/5/15 I was removed from the Bronx Halfway House due to a "false positive" of a urinalysis. This "false positive" resulted a [sic] revocation of my pre-release and revocation of my early release eligibility. While housed at MDC-Brooklyn, I was found guilty by the DHO of failing a urinalysis. Upon my arrival at FCI-Fort Dix, I filed an appeal of that DHO finding with Regional. *Every attempt to appeal, however, has been continuously frustrated to the point that I have been denied an opportunity to complete the administrative process*." (Emphasis added).

Edwin continued:

> "My first appeal was returned to me with a rejection notice dated 12/16/15. Region claimed my filing was untimely and the carbon copies were not legible. I resubmitted complete copies and explained that I had been in transit and was separated from my legal materials during the response time. Each of my next 3 submissions were rejected on timeliness grounds. During each of these attempts, I tried to comply with the timeliness requirements, but both FCI-Fort Dix and the Regional office made that impossible.

 (A true copy of the February 28, 2016 appeal is attached hereto as **Exhibit "T"**).

67.     By letter to the BOP Northeast Regional Office dated February 29, 2016, Jail Time Consulting LLC ("Jail Time"), a prison-consulting firm retained by Edwin's family, detailed the troubling circumstances of Edwin's situation, and attempted to revive Edwin's appeal. BOP did not respond to this letter. (A true copy of the February 29, 2016 Jail Time letter is attached hereto as **Exhibit "U"**).

68.    Edwin has never used codeine, morphine, or any other opiates.  This was clearly established in the Presentence Investigation Report ("PSI" that was before Judge Buchwald at sentencing, which mentioned nothing about opiate use and focused instead on alcohol and marijuana; and by the focus of his treatment in the RDAP, which also involved marijuana and alcohol.

69.    Simply put, nothing in Edwin's background or history would suggest codeine or morphine use.   However, because the BOP made it impossible for Edwin to pursue an administrative appeal, he was never able to reach the point where his arguments could be considered on the merits.

70.    Under United States Supreme Court precedent, Edwin has a liberty interest in his good time credit, RDAP credit and his halfway house residency, and they cannot be taken away from him without due process of law.  The sequence of events described herein effectively deprived him of his due process right to present evidence on his behalf. [*See* 28 C.F.R. § 541.5(b); § 541.7(e)].

**Scientific Validity of False Positive from Poppy Seed Consumption**

71.    According to the U.S. Anti-Doping Agency (the "USADA") and other reliable sources such as the *Journal of Analytical Toxicology*, the *Journal of Medical Toxicology*, and *Forensic Science International*, poppy seeds can trigger false positive drug test results for opiates such as codeine and morphine.[3]  The poppy seed defense is not a "dog ate my homework" excuse – it is accepted science.

---

[3] Relevant articles include: Rohrig TP, Moore C.  *The determination of morphine in urine and oral fluid following ingestion of poppy seeds*. J Anal Toxicol (October 2003) 27(7): 449-452; Thevis M, Opfermann G, Schanzer W. *Urinary Concentrations of Morphine and Codeine After Consumption of Poppy Seeds*. J Anal Toxicol (January-February 2003) 27(1): 53-56; Virginia Hill, Thomas Cairns, Chen-Chih Cheng, and Michael Schaffer.  *Multiple Aspects of Hair Analysis for Opiates: Methodology, Clinical and Workplace Populations, Codeine, and Poppy Seed Ingestion*. J Anal Toxicol (October 2005) 29(1): 696-703; Michael C. Milone. *Laboratory Testing for Prescription Opioids*, J. Med Toxicol. (2012) 8:408-416; Meadway C, George S, Braithwaite R. *Opiate concentrations following*

72.     According to the USADA:

"Opium is the milky substance that is extracted from the seed pod of the opium poppy once all the petals have fallen off.  Opium is composed of roughly 12% morphine . . . , codeine, and a number of other non-narcotic alkaloids. The seed pod that contains opium also happens to contain the seeds (poppy seeds). While the seeds don't contain morphine, during harvesting the seeds can become coated by, or absorb some of the opium extract. Most of the opium is removed from the seeds during processing (usually more than 90%), but in some cases, the poppy seeds sold for use in foods still have a *significant amount of opium* (and thus morphine) on them." (Emphasis added).   [*See* http://www.usada.org/can-poppyseeds-cause-a-positive-drug-test/]

73.     In addition, also according to the USADA: "[I]t is known that morphine and codeine can sometimes be detected in the urine up to 48 hours after ingestion of poppy seeds from some pastries such as bagels, muffins, and cakes." *Id.*

74.     Similarly, according to the National Institute for Drug Abuse ("NIDA"): "Once poppy seeds are eaten, the body develops detectable levels of opiates almost immediately." [*See* NIDA For Teens. *Drug Testing for . . . Poppy Seeds*?, available at: https://teens.drugabuse.gov/blog/post/drug-testing-poppy-seeds]

75.     Numerous respected scientific sources have confirmed that false positive drug test results can be triggered by poppy seed consumption.  For example, toxicologists at the Institute of Biochemistry, German Sports University Cologne conducted "[a] quantitative analysis of morphine and codeine in human urine . . .  after oral intake of cakes containing commercially available poppy seeds in order to estimate the possibility of positive doping results."  The analysis resulted in observation of "several urine specimens containing morphine with concentrations higher than 1 $\mu$g/mL [1,000 ng/mL], and peak values of approximately 10.0 $\mu$g/mL [10,000 ng/mL] . . . ." [*See* Thevis M, Opfermann G, Schanzer W. *Urinary Concentrations of Morphine*

---

the ingestion of poppy seed products—evidence for 'the poppy seed defence.' Forensic Sci Int (August 1998) 96(1): 29-38; Selavka CM. *Poppy seed ingestion as a contributing factor to opiate-positive urinalysis results: the Pacific perspective*. Forensic Sci Int (May 1991) 36(3): 685-96.

*and Codeine After Consumption of Poppy Seeds*. J. Anal. Toxicol. (Jan.-Feb. 2003) 27(1): 53-56, available at: http://jat.oxfordjournals.org/content/27/1/53.long].

76.     In another scientific study involving urine and hair samples taken from ten subjects after consumption of poppy seeds, "[t]he high urine morphine values of test subjects who ingested poppy seed demonstrates that they had absorbed significant quantities of morphine from the consumed poppy seeds."  The study found "maximum values for the subjects rang[ing] from 2,929 to 13,857 ng morphine/mL . . . . [m]ore importantly, urine levels remained above the 2000 ng/mL morphine cut-off level for as long as 10 h [hours] . . . ."  [*See* Virginia Hill, Thomas Cairns, Chen-Chih Cheng, and Michael Schaffer.  *Multiple Aspects of Hair Analysis for Opiates: Methodology, Clinical and Workplace Populations, Codeine, and Poppy Seed Ingestion*. J Anal Toxicol (October 2005) 29(1): 696-703, available at: http://jat.oxfordjournals.org/content/29/7/696.full.pdf].

77.     In contrast, Edwin's false positive urinalysis produced a far lower quantity of morphine, in the amount of 317 ng/mL (0.317 $\mu$g/mL).

78.     The phenomenon of false positives caused by poppy seed consumption has also been widely reported and recognized by respected news sources, such as *The New York Times* and *Smithsonian Magazine*.  [*See* "The Claim: Eating Poppy Seeds Can Make You Fail a Drug Test," *The New York Times*,   January   11,   2005,   available   at: http://www.nytimes.com/2005/01/11/health/the-claim-eating-poppy-seeds-can-make-you-fail-a-drug-test.html; *see also* "Finally, an Opiate Test That Doesn't Confuse Poppy Seeds with Heroin," *Smithsonian Magazine*, January 8, 2014, available at: http://www.smithsonianmag.com/smart-news/finally-an-opiate-test-that-doesnt-confuse-poppy-seeds-with-heroin-180949294/?no-ist]

**Edwin's Drug Concentrations Are Inconsistent with Illicit Codeine or Morphine Use**

79.     Under the BOP's testing methodology used by LabCorp to test Edwin's urine, the cutoff for a positive result (codeine or morphine) is any amount equal to or greater than 300 ng/mL (0.3 $\mu g$/mL).  As such, only results below the 300 ng/mL would be considered negative.  Thus, Edwin's 500 ng/mL (0.5 $\mu g$/mL) codeine result and 317 ng/mL (0.317 $\mu g$/mL) morphine result were positive results.

80.     The 300 ng/mL cutoff is inconsistent with emerging standards for opiate urine testing in the scientific community and also inconsistent with federal workplace testing standards set by U.S. agencies with expertise in the area of drug testing.  In fact, under federal occupational testing standards, Edwin's test results would have been considered negative.  The extremely low 300 ng/mL cutoff is a recipe precisely for the injustice that occurred in Edwin's case - a false positive test result, exposure to arbitrary deprivation of liberty, and a deprivation of due process rights.

81.     In 1998, the U.S. Department of Health and Human Services ("HHS") increased the cutoff for codeine and morphine testing from 300 ng/mL to 2,000 ng/mL for workplace drug testing.  [*See* HHS, Mandatory guidelines for federal workplace drug testing programs, 63 FR 63483 (1998); *see also* Albert D. Fraser and David Worth.  *Experience with a Urine Opiate Screening and Confirmation Cutoff of 2000 ng/mL*.  J. Anal. Toxicol. (Oct. 1999) 23(1): 549-551. available at http://www.ncbi.nlm.nih.gov/pubmed/10517566].

82.     As described in one study: "In order to address the problem of natural morphine and codeine in poppy seed containing products leading to a 'false' positive test for illicit drug use, the federal workplace testing guidelines raised the confirmatory morphine [and codeine]

concentration threshold to 2,000 ng/mL."  Michael C. Milone. *Laboratory Testing for Prescription Opioids*, J. Med Toxicol. (2012) 8:408-416.

83.     Indeed, "[t]he presence of morphine may also occur simply due to eating baked goods containing poppy seeds, which naturally contain small amounts of morphine and codeine . . . . [p]oppy seeds rarely yield urine morphine concentrations >2,000 ng/mL.  *Morphine or heroin abuse generally yields concentrations much higher*."  *Id*.  (Emphasis added).

84.     Similarly, "[t]he presence of codeine in the urine does not always indicate the use of codeine-containing medications.  A small quantity of codeine is present in poppy seeds along with morphine, and it may appear in the urine following consumption of poppy seeds."  *Id*.

85.     Consistent with the federally mandated HHS guidelines, the U.S. Department of Transportation ("DOT") mandates that laboratories testing DOT employees use a cutoff of 2,000 ng/mL for codeine and morphine.  [*See* 49 C.F.R. § 40.87].  Any result below 2,000 ng/mL is considered negative.

86.     Recognizing that poppy seeds can produce false positive drug test results (a single teaspoon of poppy seeds can produce opiate concentrations of 1,200 ng/mL), NIDA sets the cutoff threshold for opioids in urine at 2,000 ng/mL in accordance with HHS's 1998 cutoff increase.  [*See* "Finally, an Opiate Test That Doesn't Confuse Poppy Seeds with Heroin," *Smithsonian Magazine*, January 8, 2014].

87.     Similarly, the Substance Abuse and Mental Health Services Administration ("SAMHSA"), another agency within HHS, also sets the cutoff threshold for opioids in urine at 2,000 ng/mL, as set forth in "Analytes and Their Cutoffs."  [*See* 73 FR 71858 (November 25, 2008), announcing HHS's revised proposal to revise the Mandatory Guidelines for Federal Workplace Drug Testing Programs for urine testing, published on May 15, 2015 at 94 FR 28101].

88.     Upon information and belief, the U.S. Military uses cutoff levels of 3000 ng/mL in order to minimize false positives.  [*See* F. Bavec, M. Gorenjak, S. Grobelnik Mlakar, M. Jakop, A. Bavec, M. Bavec. *The case study and the law regulations of opiate concentrations in the seeds and urine after ingestion of poppy seeds from free market vs. rare genotypes grown under temperate climate*. University of Maribor, Slovenia, 4th International Conference on Agriculture and Horticulture, July 13-15, Beijing, China, available at: http://agriculture-horticulture.conferenceseries.com/speaker-pdfs/2015/franc-bavec-university-of-maribor-r-nslovenia.pdf; *see also* "Finally, an Opiate Test That Doesn't Confuse Poppy Seeds with Heroin," *Smithsonian Magazine*, January 8, 2014].

**Hair Drug Testing Eliminates False Positives**

89.     Codeine is typically detectable in urine for up to 48 hours, while morphine is typically detectable for 48-72 hours.  [*See* Health Partners Institute for Medical Education. *Interpretation of Opiate Drug Screens* (citing Mayo Clinic Proc. 2008; 83(1)66-76), available at: http://www.legis.state.ak.us/basis/get_documents.asp?session=28&docid=24571; *see also* SAMHSA Center for Substance Abuse Treatment. *Medication-Assisted Treatment for Opioid Addiction in Opioid Treatment Programs*, *Treatment Improvement Protocol (TIP) Series, No. 43* at 145 (2005), available at: http://www.ncbi.nlm.nih.gov/books/NBK64164/].

90.     In contrast, hair drug testing can detect these opiates for up to 90 days after use. [*See* LabCorp "Hair Drug Testing,"[4] *see also* Michael C. Milone. *Laboratory Testing for*

---

[4] Available at: https://www.labcorp.com/wps/portal/!ut/p/c1/04_SB8K8xLLM9MSSzPy8xBz9CP0os_hACzO_QCM_IwMLo1AL AyNj1yBnQxNfA4MAI30_j_zcVP2CbEdFAFDtPnI!/dl2/d1/L2dQXzgvSUhqQUFBaUlpSWlJaUlnIS80Qms0WX VHYmhoNFplR1BobjRZQkdRUmlFWmhHRVJsRVl4QSEvNl9RODZOUTJOMjA4MlU4MDIzRVJDMTRNMD BQMjg2X1E4Nk5RMk4yMEdHMkUwMjMxM0pMREQzMFA2LzZfUTg2TlEyTjIwR0cyRTAyMzEzSkxERDM wNTAvNl9RODZOUTJOMjBHRzJFMDIzMTNKTEREMzA1NS82X1E4Nk5RMk4yMEdHMkUwMjMxM0pMR EQzMEwyLzZfUTg2TlEyTjIwR0cyRTAyMzEzSkxERDMwTDcvNl9VRTRTMUk5MzAwRkg0MEkyTThQMD VGMEVFNy82X1E4Nk5RMk4yMEdHMkUwMjMxM0pMREQzMEQxLzZfUTg2TlEyTjIwODJVODAyM0VSQ zE0TTAwNTEvNl9RODZOUTJOMjBHRzJFMDIzMTNKTEREMzBUNC82X1E4Nk5RMk4yMEdHMkUwMjM

*Prescription Opioids*, J. Med Toxicol. (2012) 8:408-416 ("Hair analysis has the potential advantage of permitting detection of drug use over much longer periods . . . translating into greater detection of aberrant drug use compared with urine testing.")]. According to the Psychmedics Corporation, a prominent drug detection company, "hair is stable and [drug] deposits are permanently embedded in the hair, so hair acts like a tape recorder – 'recording' drug deposits in proportion to use over time as drugs are deposited in proportion to use."   [*See* http://www.psychemedics.com/the-science-behind-hair-analysis/].

91.   The hair drug testing process is also non-invasive and bears no risk of harm to the test subject.  According to LabCorp: "The collector obtains a 100 milligram sample of hair (90 to 120 strands) cut at the scalp.  The collector secures the hair sample in foil and completes the chain-of-custody documentation in preparation for shipment to the testing laboratory.  Since hair samples are obtained in full view of the collector, the process minimizes the likelihood of sample adulteration or specimen substitution."  [*See* LabCorp website "Hair Drug Testing," available at https://www.lapcorp.com].

92.   Unlike opiates such as heroin, codeine and morphine, "the opioid in poppy seeds does not remain in the human bloodstream long enough or in high enough concentrations to be trapped      inside      hair      follicles      in      measurable      quantities."      [*See* http://globalinc.prod.ehc.com/containers/ebsco/ebsco_detail.dot?id=156998&lang=English&format=full&db=hlt].

93.   Indeed, according to one study conducted by toxicologists from the Psychmedics Corporation, "morphine is highly unlikely to occur in head hair due to either poppy seed or codeine use."  [*See* Virginia Hill, Thomas Cairns, Chen-Chih Cheng, and Michael Schaffer.  *Multiple*

---

*Aspects of Hair Analysis for Opiates: Methodology, Clinical and Workplace Populations, Codeine, and Poppy Seed Ingestion*. J Anal Toxicol (October 2005) 29(1): 696-703].

94.     Winchester Hospital, discussing heroin testing, states that: "Hair analysis is a more accurate [than urinalysis], but less commonly used method of testing for recent heroin use: in a hair analysis, *a false positive test would not occur after eating poppy seed pastries*." [*See* Winchester Hospital. "*True or False: Easting Poppy Seed Pastries Can Lead To a Positive Drug Test for Heroin*," available at: http://www.winchesterhospital.org/health-library/article?id=156998] (emphasis added).

95.     The Food and Drug Administration (the "FDA") discussed the topic of hair drug testing for opiates at a 2000 panel meeting of its Clinical Chemistry and Clinical Toxicology Devices Panel.  One of the panelists, William Thistle, Esq., General Counsel for Psychmedics, commented: "Hair testing eliminates the poppy seed issue.  Our studies that have been submitted with this submission have shown that even massive ingestion of poppy seed products will not cause a positive hair result."  *See* FDA, Center for Devices and Radiological Health, Clinical Chemistry and Clinical Toxicology Devices Panel, Meeting (Tuesday, Nov. 14, 2000).

96.     Therefore, a hair drug test of Edwin's hair would have shown either (a) evidence of illicit opiate abuse, which would rule out poppy seed consumption as the cause of a false positive; or (b) no indication of illicit drug abuse, which would have confirmed his poppy seed consumption.

**FIRST CAUSE OF ACTION**
**Violation of Due Process Clause of the Fifth Amendment:**
**Failure to Inform LabCorp of Poppy Seed Consumption,**
**Resulting in Procedurally Tainted Drug Test**

97.     Edwin realleges and reincorporates all of the foregoing allegations as if fully set forth herein.

98.     Prior to the false positive urinalysis, Edwin informed BCRC staff member  Rohan that he had consumed poppy seeds earlier in the day, and asked that the LabCorp testing personnel be informed of this, since the poppy seed consumption would materially impact the urinalysis results.

99.     Staff member Rohan failed to inform the LabCorp testing personnel about Edwin's poppy seed consumption.  As a result, LabCorp issued a scientifically unsound lab report to the BCRC indicating positive results for codeine and morphine.

100.     By finding Edwin guilty of the disciplinary charge and punishing him accordingly based on a scientifically unsound and procedurally tainted drug test, the Respondents violated Edwin's procedural due process rights.

101.     As a result of these due process violations, Edwin has suffered a loss of liberty, including the loss of his halfway house residency, the loss of twelve months of RDAP credit, and the loss of 85 days of good time.

## SECOND CAUSE OF ACTION
### Violation of Due Process Clause of the Fifth Amendment:
### Improper Confirmatory Test Cutoff Concentration of 300 ng/mL

102.     Edwin realleges and reincorporates all of the foregoing allegations as if fully set forth herein.

103.     The testing methodology used by BOP and by BCRC's drug test administrator, LabCorp, categorizes any codeine or morphine result of 300 ng/mL or greater as a "positive" test result.  This cutoff is arbitrary, scientifically unsound, and inconsistent with the federal government's current cutoff of 2000 ng/mL, as set forth by HHS, in order to eliminate or reduce the occurrence of false positives.

104.     By finding Edwin guilty of the disciplinary charge and punishing him accordingly based on a scientifically unsound and arbitrary testing cutoff, the Respondents violated Edwin's procedural due process rights.

105.     As a result of these due process violations, Edwin has suffered a loss of liberty, including the loss of his halfway house residency, the loss of twelve months of RDAP credit, and the loss of 85 days of good time.

### THIRD CAUSE OF ACTION
**Violation of Due Process Clause of the Fifth Amendment:
Failure to Consider Evidence of Poppy Seed Consumption
and the Impact of Said Consumption on the Drug Test**

106.     Edwin realleges and reincorporates all of the foregoing allegations as if fully set forth herein.

107.     Prior to the CDC hearing, Edwin, with what little time he had to gather evidence, submitted clear evidence that he had consumed poppy seeds, including his own statement, staff member Rohan's statement, a letter from his mother, and the wrapper from the Nature's Valley breakfast biscuits.  In addition, the LabCorp urinalysis lab report itself showed that the amount of opiates in Edwin's system was so low as to likely rule out use of codeine or morphine.

108.     The CDC disregarded the evidence relating to Edwin's poppy seed consumption and found Edwin guilty of the disciplinary charge.  The DHO then upheld this finding and imposed severe punishment.  Upon information and belief, the CDC and the DHO did not consider any evidence other than the fact that the LabCorp urinalysis lab report indicated "positive" for codeine and morphine.

109.     By failing to even consider relevant evidence, the Respondents violated Edwin's due process rights.

110.    As a result of these due process violations, Edwin has suffered a loss of liberty, including the loss of his halfway house residency, the loss of twelve months of RDAP credit, and the loss of 85 days of good time.

## FOURTH CAUSE OF ACTION
### Violation of Due Process Clause of the Fifth Amendment:
### Right to Present Evidence – Hair Drug Testing

111.    Edwin realleges and reincorporates all of the foregoing allegations as if fully set forth herein.

112.    Edwin submitted multiple written requests to BOP staff for the administration of a hair drug test.

113.    A hair drug test could have exonerated Edwin of the drug use charge.

114.    The window for a hair drug test closed in January 2016, leaving Edwin without an adequate means of disproving the drug use charge.

115.    By failing to accommodate Edwin's request for a hair drug test, the Respondents violated Edwin's procedural due process rights.

116.    As a result of these due process violations, Edwin has suffered a loss of liberty, including the loss of his halfway house residency, the loss of twelve months of RDAP credit, and the loss of 85 days of good time.

## FIFTH CAUSE OF ACTION
### Violation of Due Process Clause of the Fifth Amendment:
### Right to Adequate and Fair Appeal Process

117.    Edwin realleges and reincorporates all of the foregoing allegations as if fully set forth herein.

118.    Edwin was found guilty of the drug use charge by the CDC and severely punished by the DHO in accordance with the CDC findings.  Edwin then submitted a timely appeal of the finding of guilt and the punishment.

119.    Thereafter, the BOP repeatedly rejected Edwin's appeal for purported reasons of untimeliness, even though his appeal was timely, and, *arguendo*, to the extent his appeal was untimely, the untimeliness was caused solely by the BOP.

120.    As a result of the Respondents' refusal to consider Edwin's timely appeal, he was denied the opportunity to gain consideration of his appeal on the merits.

121.    By refusing to consider Edwin's timely appeals, the Respondents violated Edwin's procedural due process rights.

122.    As a result of these due process violations, Edwin has suffered a loss of liberty, including the loss of his halfway house residency, the loss of twelve months of RDAP credit, and the loss of 85 days of good time.

## SIXTH CAUSE OF ACTION
### Violation of Due Process Clause of the Fifth Amendment:
### Summary Removal from the RDAP

123.    Edwin realleges and reincorporates all of the foregoing allegations as if fully set forth herein.

124.    On October 15, 2015, Edwin was summarily removed from the RDAP and his twelve-month sentence credit revoked without being an afforded an opportunity to contest this removal, and without any hearing specifically on the issue of his status in the RDAP.

125.    Not only was Edwin denied any opportunity to contest his removal from the RDAP, the sanction of total removal from the Program was arbitrary and excessive.

126.   By sanctioning Edwin in this manner, the Respondents violated Edwin's procedural due process rights.

127.   As a result of these due process violations, Edwin has suffered a loss of liberty, to wit: the loss of twelve months of RDAP credit.

## SEVENTH CAUSE OF ACTION
### Judicial Review Under the Administrative Procedures Act

128.   Edwin realleges and reincorporates all of the foregoing allegations as if fully set forth herein.

129.   Under the Administrative Procedures Act, the Court shall "hold unlawful and set aside agency action, findings, and conclusion" that are "contrary to constitutional right" or "without observance to the procedures required by law."  5 U.S.C. § 706(2)(B), (D).

130.   Respondents' arbitrary refusal to consider Edwin's administrative appeal, and the repeated rejection of Edwin's appeal for bogus reasons of purported untimeliness, is contrary to his procedural due process rights and contravenes Respondents' own rules and regulations.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioner Edwin Jacquet prays that this Court grant the following relief:

(a)    Assume jurisdiction over the matter.

(b)    Award the writ of habeas corpus or issue an order directing Respondents, within three days, to show cause why the writ should not be granted and set a hearing on this matter not more than five days after Respondents' return on the order to show cause, pursuant to 28 U.S.C. § 2243.

(c)    Grant the writ of habeas corpus and order Edwin's immediate release from custody at FCI Fort Dix or whichever prison facility he is being held at when the writ is granted, and order his return to the BCRC or comparable half-way house, or alternatively, order his outright release

from BOP custody; order that Edwin be restored to the RDAP and his twelve months of RDAP credit restored; and order all of Edwin's lost good time restored.

(d)      Review the discipline imposed against Edwin in its entirety, including the loss of good time, the loss of twelve months of RDAP credit, and the loss of half-way house residency, set aside the discipline imposed against Edwin in its entirety; and declare that the Respondents' discipline of Edwin violates the Due Process Clause of the Fifth Amendment.

(e)      Review the Respondents' rejection of Edwin's administrative appeal, set aside Respondents' rejections of Edwin's appeal, set aside the discipline imposed against Edwin in its entirety; and declare that Respondents' rejection of Edwin's appeal violates the Due Process Clause of the Fifth Amendment.

(f)      Award reasonable attorney's fees, costs and disbursements; and

(g)      Grant any other and further relief that the court deems just and proper.

Respectfully submitted,

**MICHAEL N. PEDICINI**
*Attorney for Edwin Jacquet*

By:      s/ Michael N. Pedicini
Attorney at Law
560 Main Street
Chatham, New Jersey 07928
Telephone: (973) 635-2555
Facsimile: (973) 635-2566

Edward A. Paltzik
Joshpe Law Group LLP
79 Madison Avenue, FL 2
New York, NY 10016
Telephone: (646) 820-6701
Facsimile: (212) 313-9478
(admission *pro hac vice* pending)

Dated: July 19, 2016

## Verification

I, Michael N. Pedicini, Esq., file the foregoing Petition for Writ of Habeas Corpus, on behalf of Petitioner Edwin Jacquet.  I swear and affirm that the allegations contained in this Petition are true and correct to the best of my knowledge.

s/ Michael N. Pedicini_____
Michael N. Pedicini

Dated: July 19, 2016